1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | CLINTON THINN,

Case No.: 22-cv-2-LAB-VET

12 |                          Petitioner,

**ORDER:**

13 | v.

14 | RAYBON JOHNSON, Warden, et

**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS. [Dkt. 1]; and**

15 | al.,

16 |                          Respondents.

17

**(2) DENYING CERTIFICATE OF APPEALABILITY**

18 | **I.    INTRODUCTION**

19         Petitioner Clinton Thinn, a state prisoner proceeding through counsel, filed

20 | a Petition for a Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254.

21 | (Dkt. 1).[1] Thinn challenges his 2018 conviction in San Diego Superior Court case

22 | number SCD270553 of first-degree murder and his resultant sentence of twenty-

23 | five years to life. (*Id.* at 1–2; *see also* Dkt. 5-2 at 123–24, Clerk's Tr. ("CT") 375–

24 | 76, Lodgment No. 1).

25         Thinn alleges his federal constitutional rights under the Fifth, Sixth, and

26 | Fourteenth Amendments were violated by: (1) the trial court's exclusion of

27
---
28 | [1] Page numbers cited in this Order refer to those imprinted by the Court's electronic case filing system.

circumstantial evidence that Thinn acted in self-defense; (2) the trial court's refusal to instruct the jury on perfect and imperfect self-defense; and (3) cumulative error. (Dkt. 1 at 6–8; 1-2 at 9–17).

Respondent Raybon Johnson filed an Answer and lodged the state court record. (Dkt. 4–5, 8). Respondent maintains habeas relief is unavailable and Thinn isn't entitled to an evidentiary hearing on his claims because (1) to the extent Thinn claims violations of state law, Claims One and Two aren't cognizable on federal review and (2) in any event, the state court adjudication of each of Thinn's three claims on the merits is neither contrary to or an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts. (Dkt. 4 at 2; 4-1 at 10–19).

Thinn has also filed a Traverse, in which he admits in general that claims which raise only state law violations aren't cognizable on federal habeas, but maintains his claims are based on the federal constitution and alleges the state court adjudication of his claims are contrary to and/or an unreasonable application of clearly established law. (Dkt. 6 at 2). Thinn also disputes Respondent's contention he isn't entitled to an evidentiary hearing on his habeas claims and "denies that the state court reasonably found the facts but alleges that the record contains sufficient facts to rebut the state courts [sic] findings without necessarily taking new evidence at a hearing." (*Id.*).

The Court has reviewed the briefing, documents filed, and the legal arguments presented by both parties. For the reasons discussed below, the Court **DENIES** the Petition and **DENIES** a certificate of appealability.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court gives deference to state court findings of fact and presumes them to be correct; Thinn may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35–36 (1992) (holding findings of historical fact, including inferences

properly drawn from those facts, are entitled to statutory presumption of correctness); *Sumner v. Mata*, 449 U.S. 539, 545–47 (1981). The California Court of Appeal affirmed the judgment in *People v. Thinn*, D074397 (Cal. Ct. App. July 23, 2020), (*see* Dkt. 5-18, Lodgment No. 8), and summarized the following:

> Defendant Clinton Thinn was placed in cell 4 of module 5-B of Central Jail on November 21. Victim Lyle W. became his cellmate two days later. At 1:49 a.m. on the morning of December 3, inmate L.F. joined them. When L.F. arrived, it seemed that Thinn and Lyle were getting along. Lyle was talkative and was describing a collage he was making, while Thinn looked on. L.F. offered Lyle a small amount of methamphetamine that he had snuck into the jail and promptly went to sleep on the bottom bunk. Sometime later, Lyle woke L.F. to ask whether he and Thinn could have the rest of L.F.'s methamphetamine. L.F. asked if they could get him coffee in the morning, and Lyle said they would try. L.F. then gave the remainder to Lyle and returned to sleep. When he awoke, Lyle was unresponsive on the floor, and deputies were at the cell door.

> Module 5 was under lockdown all morning on December 3, meaning inmates could not leave their cells. Deputies delivered medication for Lyle that morning. A hard count taken around noon indicated that all inmates were accounted for and in their cells. San Diego County Sheriff's Deputy Trevor Newkirk observed nothing unusual during his hard count—Thinn and Lyle seemed to get along like normal cellmates. Deputy Matthew Charlebois agreed, recalling that Thinn and Lyle "appeared to be talking and almost kind of laughing with each other."

> At 12:55 p.m., Thinn pressed the intercom button in cell 4, sending a signal to the tower overlooking the entire fifth floor. Deputy Charles Delacruz listened as Thinn asked for a nurse to check his cellmate's vitals. Delacruz logged a "man down" call, paging colleagues to the scene. Deputy Charlebois was the first to arrive at cell 4. He saw Thinn standing over Lyle's feet, staring toward both Lyle and the cell door with a "1,000 yard stare." Thinn seemed

out of breath, was breathing heavily, and had red marks on his shirtless chest and stomach area. Deputy Newkirk arrived around that same time to find Lyle lying prone, face down, with his head near the cell door. He too described Thinn as standing in the middle of the cell, looking toward Lyle. Thinn was shirtless, out-of-breath, and appeared flush or red in the face. Newkirk described his expression as akin to a deer in headlights, eyes wide with surprise.

L.F. was laying in the bottom bunk when Newkirk opened the cell. He was fully clothed and had apparently been sleeping. Unlike Thinn, L.F. was neither flushed nor out of breath; he seemed confused when escorted out. Newkirk removed L.F. and Thinn to seek medical assistance for Lyle. As Thinn waited in the holding area, Deputy Christopher Simms observed him pacing the room for fifteen to twenty minutes, periodically staring at Simms with wide eyes and sitting down on a table. Deputy Curtis Stratton described Thinn's torso as appearing flush during this time, as if he had just been exercising. He was breathing heavy and had shaky hands and blood around his fingernails. The forensic evidence technician took photographs of blood in the nail bed of Thinn's left thumb and purple discoloration in the tops of his knuckles. DNA analysis later tied the blood found on Thinn's thumbnail to Lyle.

Lyle was transported to the hospital but never regained consciousness. He died a week later when his family removed him from life support. Given reports that there had been an altercation at the jail, Lyle's father examined his son's hands but saw nothing other than bruising on Lyle's face. The autopsy concluded that Lyle died by homicide from ligature strangulation. Petechiae, or tiny hemorrhages, in Lyle's eyes were consistent with asphyxiation, and there was bruising and bleeding in his mouth. The medical examiner identified a linear scab on Lyle's neck. Because there were no ligature marks on the back of Lyle's neck, it was likely that the ligature was applied with more force or friction to the front. Deputy Stratton explained that the red mark on the front of Lyle's neck looked almost like a necklace had been ripped off of

him from behind. Although the medical examiner could not determine how long the ligature had been applied to Lyle's neck, she explained that it typically takes anywhere from a few minutes to ten minutes for strangulation to cause irreversible brain damage.

A thorough search of the cell revealed a piece of blue fabric, potentially fashioned from jail garments, in the toilet. The medical examiner believed it was possible that the mark on Lyle's neck had been formed by the piece of fabric found in the toilet. Inmates at San Diego Central Jail receive one set of jail-issued clothing per week, consisting of a blue shirt and pair of pants and undergarments. L.F. was fully clothed when deputies arrived. Lyle and Thinn were both shirtless. One blue shirt was found hanging in the cell, but it was not ripped or torn in any manner to be linked to the fabric from the toilet. A careful search did not reveal any torn pieces of blue clothing or torn sheets in the cell that could be linked to the torn fabric in the toilet.

The San Diego County District Attorney charged Thinn with first degree murder. During pretrial motions in limine in Thinn's first trial, Judge Frederick Maguire ruled that he would allow the defense to present expert testimony by Francisco Mendoza, who would explain racial divisions and politics in San Diego Central Jail. The court explained that it had no problem admitting general testimony by Mendoza indicating a hostile racial environment at the jail, but the extent of Mendoza's testimony would be limited based on evidence already in the record as to whether *Thinn* was vulnerable, alone, or the victim of racial politics. As was apparent to the jury in both trials, Thinn was White, while Lyle and L.F. were Black.

On January 25, 2018, prospective jurors saw Thinn in handcuffs during jury selection, prompting a mistrial. With a new jury empaneled, trial continued before Judge Maguire. The prosecution argued that the nature of the killing—ligature strangulation from behind for some number of minutes—supported a finding of premeditated and deliberated murder. Thinn in turn argued perfect or imperfect self-defense.

Viewing a video of breakfast service from another day, a drug treatment expert testified for the defense that Lyle's random movements were consistent with methamphetamine use. A psychiatrist opined that methamphetamine use is associated with unpredictable and irrational violence. Inmate Clyde M. testified that immediately after the incident, Thinn yelled, "man down" through the vents, asking for help. A defense investigator who observed Thinn's hands more than a year after the incident described them as naturally purplish in color.

But the heart of the defense focused on Thinn's vulnerability as a foreigner. Inmate Mario L. explained that although module 5-B was designed as a race-neutral incentive module, racial tensions remained. Thinn was an outsider; people took advantage of him by raiding his commissary. Alexander W. explained that racial politics were widespread in module 5-B. Thinn was obviously a foreigner, spoke with an accent, and "didn't seem to fit in anywhere." He kept to himself whereas Lyle was the opposite, ordering other inmates around. Lyle seemed to bully Thinn by taking his food without permission. Taking food in jail is "a very big deal" and "could have severe consequences." When someone of a different race steals an inmate's food, a failure to protect oneself could precipitate a race riot.

Expert Francisco Mendoza then took the stand. He explained that foreigners are isolated at Central Jail; lacking a defined race category, they become targets for violence, demands for sexual favors, or demands for commissary as "rent" for protection. Stealing another inmate's food was a serious matter and could escalate to violence or death. Mendoza explained that Thinn's behavior in the jailhouse breakfast video was unusual. He waited until all other inmates finished eating to leave his cell. This behavior suggested to Mendoza that Thinn felt isolated, without anyone to back him up. By contrast, Lyle appeared neither vulnerable nor isolated; he was the first one out for breakfast and appeared like a jail "regular."

Judge Maguire decided to instruct the jury on self-defense and imperfect self-defense. Although he did not

find the defense evidence compelling, the theories were within the realm of possibilities that a rational jury could accept. Sure enough, a second mistrial was declared after the jury failed to reach a verdict. Jurors hung on degree—five found first degree murder, two found second degree murder, and five found voluntary manslaughter.

A third jury was empaneled for a second trial, which began in June 2018 before Judge Leo Valentine, Jr. During motions in limine, the court pressed defense counsel to identify the *evidence* it claimed supported its self-defense theory. Defense counsel explained his intent to show that Thinn was being bullied and, given jailhouse race politics, felt isolated as a foreigner. Counsel suggested that Thinn was defending himself from Lyle's methamphetamine-induced attack.

The court found this proffer speculative—that Lyle may have taken methamphetamine did not support a nonspeculative inference that he attacked Thinn on December 3. Moreover, experts could not testify about jailhouse race relations absent any indication those dynamics were at play when Lyle was strangled. Thinn could show that he was bullied by Lyle, though the court cautioned that this might support premeditation. But there would be no expert or percipient witness testimony on jailhouse race relations. When pressed by defense counsel, the court explained that although various things *could* have happened in the cell, racial dynamics only supported a speculative inference as to what actually happened unless there was something more to suggest that Lyle attacked Thinn in the cell because of his race.

Given the court's evidentiary rulings, Thinn's second trial was considerably shorter than his first. The prosecution's case remained the same—the nature of the strangulation from behind for some number of minutes supported a finding of premeditated and deliberated first degree murder.

Near the end of the prosecution's case-in-chief, the parties held an extended discussion as to whether the jury would be instructed on self-defense. Arguing the red marks

on Thinn's chest were consistent with a struggle, defense counsel maintained self-defense instructions were supported by the evidence. He reiterated his view that evidence of racial dynamics at Central Jail, bullying by other inmates, and the effects of Lyle's methamphetamine use would support a claim of self-defense, but complained that this proffer had been precluded. The court disagreed— bullying evidence had not been excluded, but jailhouse politics "provides fodder for speculation" without giving jurors any evidence of what happened in the cell. As the court explained, self-defense requires some information about a defendant's state of mind, and all the evidence sought to be introduced by the defense did not support any nonspeculative finding in that regard. Based solely on the prosecution's evidence of red marks on Thinn's chest, there was insufficient evidence for a self-defense instruction.

Ultimately, the defense examined a single witness at the second trial, investigator Tanya Kunz. As she did in the first trial, Kunz explained the purple marks found on Thinn's knuckles by deputies on the day of the incident: Thinn's hands appeared purple in their ordinary course. Although the defense subpoenaed Clyde M. to testify that Thinn cried out for help, he did not appear and could not be found.

At the close of trial, defense counsel pressed for an instruction on voluntary manslaughter based on a heat of passion theory. The court refused the request, explaining there was no evidence of a motive or disagreement to support a nonspeculative theory that Lyle had been killed in a heat of passion. The jury was instructed on first degree premeditated and deliberated murder and second degree malice murder. It was not instructed on voluntary manslaughter, self-defense, or imperfect self-defense.

During closing arguments, defense counsel argued there was no evidence of premeditation or deliberation to support a conviction for first degree murder, as Thinn and Lyle had been laughing just 40 minutes before the homicide. Rejecting this argument, the jury convicted Thinn of first degree murder. The trial court sentenced him to 25 years to life in state prison.

1   (*id.* at 2–9 (emphasis in original)).

2          Thinn appealed the judgment to the California Court of Appeal, raising Claim
3   One presented here in the opening brief and raising Claim Two and Claim Three
4   presented here in the supplemental opening brief. (*See* Dkt. 5-13, 5-15, Lodgment
5   Nos. 3, 5). On July 23, 2020, in a reasoned opinion, the Court of Appeal denied
6   each of the three claims and affirmed Thinn's judgment. (Dkt. 5-18, Lodgment
7   No. 8). Thinn thereafter raised all three claims presented here in a petition for
8   review with the California Supreme Court. (Dkt. 5-19, Lodgment No. 9). On
9   September 23, 2020, the California Supreme Court denied the petition in a
10  decision stating in full: "The petition for review is denied." (Dkt. 5-20, Lodgment
11  No. 10).

12         On January 3, 2022, Thinn filed a federal Petition and accompanying
13  memorandum which raised three claims for relief. (Dkt. 1). On April 4, 2022,
14  Respondent filed an Answer and accompanying memorandum and lodged
15  portions of the state court record. (Dkt. 4–5). On April 22, 2022, Thinn filed a
16  Traverse. (Dkt. 6). On October 20, 2022, Respondent filed a supplemental notice
17  of lodgment which included Supplemental and Augmented Reporter's Transcripts.
18  (Dkt. 8).

19  **III.   THINN'S CLAIMS**

20         (1) The trial court's exclusion of circumstantial evidence that Thinn acted in
21  self-defense deprived him of his right to present a defense in violation of the Fifth,
22  Sixth, and Fourteenth Amendments. (Dkt. 1 at 6; 1-2 at 9–13).

23         (2) The trial court's refusal to instruct the jury on perfect and imperfect self-
24  defense lessened the prosecution's burden of proof and violated Thinn's federal
25  due process right to a determination beyond a reasonable doubt of all the
26  elements of the offense charged and to have the jury consider his defense in
27  violation of the Fifth, Sixth, and Fourteenth Amendments. (Dkt. 1 at 7; 1-2 at 13–
28  17).

(3) The cumulative effect of the errors identified in Claims One and Two deprived Thinn of his federal right to due process and a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments. (Dkt. 1 at 8; 1-2 at 17).

## IV. STANDARD OF REVIEW

Thinn's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 326–29 (1997). A state prisoner isn't entitled to federal habeas relief on a claim that the state court adjudicated on the merits unless the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (quoting 28 U.S.C. §§ 2254(d)(1)–(2)).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953 (9th Cir. 2004). With respect to § 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333,

338–39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The United States Supreme Court recognized that "[a]s amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings," but instead "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 102. In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (*per curiam*)).

# V.    DISCUSSION

Thinn raised each of the three claims presented here in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without a statement of reasoning. (*See* Dkt. 5-19, 5-20). The United States Supreme Court has repeatedly stated that a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. 122, 128 (2018) ("We conclude that federal habeas law employs a 'look through' presumption."). As such, in the absence of record evidence or argument seeking to rebut this presumption, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to each of Thinn's three federal habeas claims. *See Nunnemaker*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them *no*

effect-which simply 'looks through' them to the last reasoned decision-most nearly reflects the role they are ordinarily intended to play.") (emphasis in original) (footnote omitted)).

While the state court doesn't appear to have specifically addressed Thinn's federal claims, the Court must also presume the state court adjudicated both the state and federal contentions on the merits and AEDPA applies to each of Thinn's three federal habeas claims, given the lack of any indication otherwise. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *see also Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

## A.   Claim One

Thinn first contends the trial court's decision to exclude proffered circumstantial evidence that he acted in self-defense deprived him of his right to present a defense in violation of the Fifth, Sixth, and Fourteenth Amendments. (Dkt. 1-2 at 9–13).

The California Court of Appeal rejected this claim in a reasoned decision as follows:

> At his first trial, Thinn introduced testimony by inmates Mario L. and Alexander W. about race relations in module 5-B and patterns of bullying between Lyle and Thinn. He also introduced testimony by expert Francisco Mendoza to explain how being a foreigner left him exposed and vulnerable. In the second trial, Judge Valentine permitted the defense to introduce evidence that Thinn was being bullied, but excluded evidence regarding jailhouse

racial politics. Although Thinn challenges this ruling on appeal, we conclude no error occurred.

Only relevant evidence is admissible (Evid. Code,[1] § 350)—that is, evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) Evidence that leads only to speculative inferences is irrelevant. (*People v. Morrison* (2004) 34 Cal.4th 698, 711.) Mindful that trial courts have broad discretion to determine relevancy of evidence, error will be found only if a court "acted in an arbitrary, capricious, or patently absurd manner." (*People v. Jones* (2013) 57 Cal.4th 899, 947.)[2]

[1] Unless otherwise indicated, further statutory references are to the Evidence Code.

[2] Thinn cites section 352 and maintains that application of this statute "must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) His argument, however, misconstrues the record. The court did not deem the jailhouse race politics *relevant* but nonetheless exclude it under section 352 as necessitating an undue consumption of time. Rather, it concluded the evidence supported only a *speculative* inference as to what happened in the jail cell and therefore excluded it on relevancy grounds. Because we agree with this analysis, we need not consider whether its exclusion was separately appropriate under section 352.

Because the racial tension evidence was offered to show self-defense, understanding the components of that theory is critical to evaluating its relevance. "Self-defense is *perfect* or *imperfect*. For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury. [Citation.] A killing committed in perfect self-

22-cv-2-LAB-VET

defense is neither murder nor manslaughter; it is justifiable homicide." (*People v. Randle* (2005) 35 Cal.4th 987, 994.) Although a person acting in *imperfect* self-defense "also actually believes he must defend himself from imminent danger of death or great bodily injury," that belief is *unreasonable*. (*Ibid.*) "Imperfect self-defense mitigates, rather than justifies, homicide; it does so by negating the element of malice." (*Ibid.*; see *People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).)

"The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 (*Viramontes*).) "If the trier of fact finds the requisite belief in the need to defend against imminent peril, the choice between self-defense and imperfect self-defense properly turns upon the trier of fact's evaluation of the reasonableness of appellant's belief." (*Ibid.*)

Thinn elected not to testify. His cellmate L.F. was the only other potential witness, but he was asleep the entire time. Although Thinn is correct that a defendant's testimony is not always required to show self-defense (see *Viramontes*, *supra*, 93 Cal.App.4th 1256; *People v. Ororpeza* (2007) 151 Cal.App.4th 73, 82 (*Oropeza*)), the circumstances of *this case* likely required such testimony. Without it, there was no *evidence* of Thinn's actual state of mind. Absent some indication of what occurred in cell 4 on December 3, there was no basis for the jury to believe that Lyle threatened or attacked Thinn. Nor is there any rational basis for a jury to find that Thinn actually believed in the need to defend himself against imminent danger of death or great bodily harm when he strangled Lyle from behind. Any inference as to Thinn's state of mind is *speculative*: with no evidence to moor it, testimony that racial politics were rampant in module 5-B or that Thinn as a foreigner was particularly vulnerable would only support a speculative, rather than reasonable, inference as to what happened in cell 4 on December 3. Speculative evidence is properly excluded on relevancy grounds. (See *People v.*

*Babbitt* (1988) 45 Cal.3d 660, 682 ["'The inference which defendant sought to have drawn from the [proffered evidence] is clearly speculative, and evidence which produces only *speculative* inferences is *irrelevant* evidence.'"].)[3]

> [3] Indeed, the foundation was far weaker at the second trial, where the defense chose not to examine fellow inmates Mario L. and Alexander W. about Lyle's bullying of Thinn. Far from suggesting any underlying tension between inmates, the only evidence presented at the second trial showed that Lyle and Thinn seemed to get along.

Thinn's authorities do not suggest otherwise. In *Viramontes*, two defense witnesses "testified they saw someone shoot at [defendant] first." (*Viramontes*, *supra*, 93 Cal.App.4th at p. 1263.) Supporting their account was "undisputed forensics evidence establishing the use of two guns" and witness accounts of "a pause between the first shot and subsequent shots." (*Ibid.*) Likewise, in *People v. Minifie* (1996) 13 Cal.4th 1055 (*Minifie*), the defendant testified that he shot in the victim's direction because he thought the victim was reaching for his crutches to hit him over the head. (*Id.* at pp. 1063–1064.) Expert testimony regarding battered women's syndrome was admissible to explain the reasonableness of the defendant's actions in *People v. Humphrey* (1996) 13 Cal.4th 1073, where the defendant testified to shooting her intimate partner because she thought he was reaching for a gun to shoot her. (*Id.* at p. 1080.) And evidence that the victim had heroin in his system was admissible to corroborate claims of erratic behavior in *People v. Wright* (1985) 39 Cal.3d 576, where in prior statements and trial testimony the defendant stated the victim had threatened him and was reaching toward his back pocket for what the defendant believed to be a weapon. (*Id.* at pp. 581–582, 583–584.)

Thinn relies heavily on *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, but there too, the evidence supported a rational jury finding that the defendant was in fear when he stabbed the victim. Defendant Sotelo-Urena,

a homeless man, was on trial for the murder of Nicholas Bloom, another homeless man, who he stabbed 70 to 80 times with a large kitchen knife. (*Id.* at p. 740.) Although Sotelo-Urena did not testify at trial, the jury heard recordings of two police interviews. (*Id.* at p. 737.) In them, Sotelo-Urena said he was sitting on the library steps at night reading when Bloom approached him and aggressively asked for a cigarette. When Sotelo-Urena replied that he did not have one, Bloom moved in as if to fight. Sotelo-Urena was pretty sure Bloom was one of the people who had attacked him in the past, and when Bloom reached to grab something from his pocket or waistband, he assumed Bloom was grabbing a knife. Perceiving he was in danger yet again, Sotelo-Urena grabbed a kitchen knife from his backpack and told Bloom to get away. But Bloom just laughed like he wanted to hurt Sotelo-Ureno, prompting the latter to respond to the threat. (*Id.* at pp. 737–738.) Other evidence at trial demonstrated that Sotelo-Urena waited for police to arrive, told responding officers that Bloom was trying to kill him, and showed them the kitchen knife he had used to stab him. (*Id.* at pp. 739–740.) The jury likewise heard evidence that Bloom had injected a large amount of methamphetamine was acting aggressively before he was stabbed. (*Id.* at p. 737.)

Against this backdrop, Sotelo-Urena proffered expert testimony of a retired judge who would explain the effects of increased victimization and risks of violence faced by the chronically homeless. (*Sotelo-Urena*, *supra*, 4 Cal.App.5th at pp. 741–742.) Based on local and national studies, the defense expert "was prepared to testify that the vulnerability to violence experienced by homeless people tends to create a greater than normal sensitivity to perceived threats of violence." (*Id.* at p. 742.) The exclusion of the homelessness evidence on this record was error— the expert testimony was probative both of the defendant's actual belief in the need to defend himself and the reasonableness of that belief. (*Id.* at pp. 750, 752.) It was also probative of the defendant's credibility—i.e., whether the jury should believe Sotelo-Urena's statements to police. (*Id.* at p. 752.)

22-cv-2-LAB-VET

It is not enough to say, as Thinn argues, that the "jailhouse-politics evidence here was analogous to the homelessness evidence in *Sotelo-Urena*." While the two types of evidence may share some similarities, their admissibility turns in each case on the presence of foundational facts. Where, as here, there is no evidence regarding the circumstances of the attack, contextual evidence only invites speculative rather than reasonable inferences as to Thinn's state of mind. Thus, it cannot be said to have a tendency in reason to prove a disputed material fact. (§ 210.)

In summation, to prove his or her own frame of mind to argue self-defense, a defendant is entitled to corroborate testimony that he or she was in fear of peril by proving the reasonableness of such fear. (*Minifie*, *supra*, 13 Cal.4th at p. 1065.) A defendant may likewise offer contextual evidence to help the jury understand the situation from his or her perspective. (*Sotelo-Urena*, *supra*, 4 Cal.App.5th at p. 745.) But without direct or circumstantial evidence suggesting the defendant *was* subjectively in fear at the time he killed, corroborating testimony lacks foundation and cannot be admitted on its own to prove that ultimate fact. General evidence of jailhouse racial tensions supported at best a speculative inference as to what might have happened in cell 4 on December 3. Absent some evidence that Lyle attacked Thinn, or that Thinn was subjectively fearful of such an attack, this evidence as inadmissible to support a defense theory of perfect or imperfect self-defense.

(Dkt. 5-18 at 9–15 (alterations and emphasis in original)).

Respondent first maintains "[t]he state court's determination that the trial court did not abuse it's [sic] discretion in excluding the proffered evidence was reasonable" and "[m]ore importantly, the state court's finding that the evidence was properly excluded under state law is binding on this Court." (Dkt. 4-1 at 13 (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 630 & n.3 (1988); and *Mullaney v. Wilbur*, 421 U.S. 684, 691 & n.11 (1975)). While Respondent's observation is accurate, Thinn clearly

asserts the state trial court's exclusion of the proffered evidence violated his federal constitutional right to present a defense, and that alleged violation, not any potential state law error, is the issue before this Court. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.") Indeed, "[w]hile a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'" *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)).

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (same). "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326.

In this instance, the defense sought to introduce and present evidence and testimony about jail politics and race relations, as well as the victim's drug use and mental issues, to provide support for the defense's self-defense theory, "so

the jury can draw reasonable inferences that there was an attack" and that "in jail the need to use self-defense is frankly somewhat heightened because you can be attacked with weapons or you can be attacked in a deadly manner, and you're within a confined space." (Dkt. 8-2 at 32–33, Augmented Reporter's Tr. ("ART") 132–33). To this, the trial court responded:

> I understand. You just made my point: "You could be." "You could be." "You could be." The question here is what happened? If your client is not prepared to get on the stand and tell the jurors what happened, you're asking me to allow you, then, to put on a bunch of speculation about what could have happened; not what happened, what may have happened. There's multiple things that may have happened. We have no idea what happened.

> So unless you've got something to suggest that [the victim] attacked your client, it's a stretch to get self-defense. I just want to make sure you understand that before you get to your case, because I'm not going to allow evidence in that causes the trier of fact to speculate, because I'm going to instruct them they're not to speculate.

(*id.* at 33). The trial court went on to explain the reasons supporting the decision, noting while:

> It may be of interest of what the politics are in the jail, but unless you tell me and you've got evidence that your client was being attacked because of race, because of politics, because of anything other than human behavior, I don't see why we need to spend time educating these citizens about jailhouse politics. [¶] I understand that may be your theory, but self-defense does not apply to the reasonable inmate in jail. Self-defense applies to the reasonable person under similar circumstances. . . . [¶] So when you want to talk about jailhouse politics, what would an inmate feel compelled to do under these circumstances, that's not the standard of reasonableness for self-defense. It's a reasonable person.

(*id.* at 39–40). In response to defense counsel noting Thinn had a "red" chest and "marks on his hands and on a toe," the trial court stated:

I'm trying to get the record clear for appellate purposes. If you have evidence that he attacked your client, I'm going to ask you what it is; if you don't, I just want the record to reflect that you don't; that you're asking to use circumstantial evidence to argue that he attacked your client.

Well, I will concur that is physical evidence that something happened. I don't know that it's physical evidence that he was assaulted. I understand that -- for the Court, that's much closer than the speculation about jail politics and what may or may not have happened. To the extent your client has got bruises, he's got what appears to be -- whether he's been attacked or defensive wounds, whatever they are, that's physical evidence. That's relevant. That's admissible.

But what the politics are, how that affected your client, is pure speculation. I just want you to understand how this court is making that distinction.

(*id.* at 42–43).

While Thinn didn't testify at trial, Lonzell Fudge, the third inmate in the cell at the time of the killing, did testify. After he was placed in the cell with Thinn and the victim, Fudge stated he offered a piece of the methamphetamine he had to the victim, who accepted it, but Fudge never saw if anyone consumed or used it. (*Id.* at 470, 473–74). When the victim asked Fudge for another piece, Fudge provided it and stated he would like it if someone could get him coffee. (*Id.* at 474). According to Fudge, Thinn remained in another area of the cell during this time but wasn't asleep. (*Id.* at 471, 474). After that, Fudge stated he rolled back over to go back to sleep; he next recalled rolling over to see a deputy and the cell door open. (*Id.* at 475). Fudge stated: "I had no idea what happened like at all. I was just waking up out of sleep." (*Id.* at 476).

As the state appellate court reasonably found, the trial court's conclusion was both reasonable and well-supported, in that: "Where, as here, there is no evidence regarding the circumstances of the attack, contextual evidence only

invites speculative rather than reasonable inferences as to Thinn's state of mind" and "without direct or circumstantial evidence suggesting the defendant *was* subjectively in fear at the time he killed, corroborating testimony lacks foundation and cannot be admitted on its own to prove that ultimate fact." (Dkt. 5-18 at 14 (emphasis in original)). Indeed, in the absence of any evidence, whether direct or circumstantial, as to what occurred in the cell or that could support a finding Thinn was in fear at the time the victim was killed, it was clearly within the trial court's discretion to exclude the proffered evidence of jail racial politics. *See, e.g.*, *Holmes*, 547 U.S. at 326 ("[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.").

Thinn nonetheless contends "the circumstantial evidence suggested Petitioner acted in self-defense" citing the peaceful co-existence between Thinn and the victim prior to another inmate bringing drugs into the cell and giving them to the victim, asserting "[t]he logical inference was that the methamphetamine caused [the victim] to precipitate some sort of conflict with Petitioner," and "Petitioner appeared disturbed by whatever transpired and pushed the call button to summon help, suggesting he did not intend for [the victim] to die." (Dkt. 1-2 at 13). But a different potential inference that could be drawn from the circumstantial evidence was everything was indeed peaceful in the cell until methamphetamine was introduced, which precipitated an altercation started by Thinn, who wanted the drugs that had been given to the victim and resulted in Thinn strangling the victim from behind while Fudge slept. Alternately, yet another potential inference given Fudge's testimony he didn't see who used or consumed the drugs could be that Thinn took some of the drugs, which caused Thinn to act violently and strangle the victim. After the killing, Thinn then pushed the call button due to remorse, fear the incident had gotten out of hand, or after sobering up. In any event, the "inference" Thinn suggests is clearly not the only possible one

which could be drawn and there is no evidence in the record as to the circumstances of the altercation that led to the victim's death, much less evidence supporting self-defense as opposed to other potential explanations, particularly as the victim was strangled from behind.

Given Thinn didn't testify at trial and the third cellmate present at the time of the killing stated he was asleep, the state court correctly and aptly observed that "[a]bsent some indication of what occurred in cell 4 on December 3, there was no basis for the jury to believe that [the victim] threatened or attacked Thinn" and there isn't "any rational basis for a jury to find that Thinn actually believed in the need to defend himself against imminent danger of death or great bodily harm when he strangled [the victim] from behind." (Dkt. 5-18 at 11).

The state court also rightly noted "the foundation [for self-defense] was far weaker at the second trial, where the defense chose not to examine fellow inmates [] about [the victim's] bullying of Thinn" and "[f]ar from suggesting any underlying tension between inmates, the only evidence presented at the second trial showed that [the victim] and Thinn seemed to get along." (*Id.* at 12 n.3). Indeed, Deputy Matthew Charlebois testified that when he passed by the cell around noon on the day in question for the hard count, Thinn and the victim "appeared to be talking and almost kind of laughing with each other," and noted the victim "was sitting on the toilet inside the cell using it as a chair" while Thinn "was standing inside the cell." (Dkt. 8-2 at 671). Similarly, Fudge testified that when he was placed in the cell with Thinn and the victim, the two cellmates were "getting along." (*Id.* at 468).

Based on the lack of any direct or circumstantial evidence as to Thinn's state of mind at the time of the killing, much less evidence that the killing had any connection to the fact that the victim and Thinn weren't of the same racial background, the trial court correctly concluded Thinn's proffered self-defense evidence would only invite speculation without basis and accordingly, the Court can't conclude the trial court's "evidentiary decision created an absence of

fundamental fairness that 'fatally infected the trial,'" *Ortiz-Sandoval*, 81 F.3d at 897 (quoting *Kealohapauole*, 800 F.2d at 1465), or deprived Thinn of "'a meaningful opportunity to present a complete defense,'" *Crane*, 476 U.S. at 690 (quoting *Trombetta*, 467 U.S. at 485).

Because Thinn fails to demonstrate the state court rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts, Claim One doesn't merit habeas relief. To the extent Thinn requests an evidentiary hearing on this claim, the Court's conclusion habeas relief isn't warranted based on a review of the record renders an evidentiary hearing unnecessary. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state record." (emphasis in original)).

### B.   Claim Two

Thinn next contends the trial court's refusal to instruct the jury on perfect and imperfect self-defense lessened the prosecution's burden of proof and violated his federal due process right to a determination beyond a reasonable doubt of all the elements of the offense charged and to have the jury consider his defense. (Dkt. 1-2 at 13–17).

The California Court of Appeal rejected this claim in a reasoned decision as follows:

> Thinn next raises a related claim of instructional error. Toward the close of the prosecution's case-in-chief, the parties discussed jury instructions. The court stated that CALCRIM No. 505 (Self-Defense) was "just in there so it can be taken out, but at the present time, the evidence does not support [it]." Defense counsel interjected that red marks on Thinn's chest were sufficient "for a juror to draw a conclusion that a fight occurred and that Mr. Thinn was acting in self-defense." After an extended discussion revisiting the exclusion of jailhouse racial politics evidence,

the court disagreed—evidence of red marks on Thinn's chest was insufficient to support an instruction on self-defense.

On appeal, Thinn contends the trial court erred by failing to instruct the jury on self-defense and imperfect self-defense.[4] In addition to red marks on his body "suggesting a physical struggle," Thinn points to evidence that he pressed the intercom in cell 4 to seek medical assistance for Lyle. Moreover, he argues that surveillance video informed jurors "that the jail was generally segregated by race, that Thinn was a White inmate in a cell with two Black inmates, and that a deputy who worked at the jail found this fact remarkable." Relying again on *Viramontes*, *supra*, 93 Cal.App.4th 1256, Thinn argues instructions on perfect and imperfect self-defense were warranted notwithstanding his decision not to testify.

> [4] Although counsel only objected to the omission of instructions on self-defense, Thinn maintains the court had a sua sponte duty to instruct jurors on imperfect self-defense. "A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense." (*Simon*, *supra*, 1 Cal.5th at p. 132.) Voluntary manslaughter based on imperfect self-defense is an uncharged lesser offense of first degree murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

"We review a trial court's decision not to instruct on perfect self-defense or imperfect self-defense de novo." (See *Simon*, *supra*, 1 Cal.5th at p. 133; *People v. Waidla* (2000) 22 Cal.4th 690, 733.) No instructions on either theory are warranted "absent substantial evidence to support them." (*People v. Stitely* (2005) 35 Cal.4th 514, 551 (*Stitely*).) In reviewing the evidence supporting an instruction, we construe the record in the light most favorable to the defendant. (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483.) As we explain, no error occurred.

For both perfect and imperfect self-defense, a defendant must actually believe in the need to defend himself or herself against imminent peril to life or great bodily injury. (*Viramontes*, *supra*, 93 Cal.App.4th at p. 1262.) "To require instruction on either theory, there must be evidence from which the jury could find that appellant actually had such a belief." (*Ibid.*) Thus in *Stitely*, *supra*, 35 Cal.4th 514, the court properly refused instructions on perfect or imperfect self-defense where there was no substantial evidence that the defendant was in *actual* fear of *imminent* harm. (*Id.* at p. 552.) In *Oropeza*, instructions on self-defense and imperfect-self-defense were properly denied in the absence of evidence suggesting that the defendant fired shots out of fear. (151 Cal.App.4th at p. 82.) Similarly, where a "defendant did not testify as to any apprehension or danger he may have felt" and no other witness testified that he "acted out of reasonable fear," there was "no substantial evidence of perfect self-defense" to support an instruction in *People v. Hill* (2005) 131 Cal.App.4th 1089, 1102 (*Hill*). A different result was reached in *Viramontes* based on an entirely different record—if the defense witnesses in *Viramontes* were believed, the jury "could find appellant had an actual belief that he was in imminent peril and that lethal force was necessary to defend himself against the person who shot at him." (*Viramontes*, at p. 1263.)

Simply put, there is no substantial evidence here that would support a perfect or imperfect self-defense instruction here. Even if jurors accepted that Thinn and Lyle engaged in a mutual struggle—despite the come-from-behind strangulation and lack of marks on Lyle's hands—there is no evidence from which jurors could make a reasonable, as opposed to speculative, finding as to Thinn's state of mind when he strangled Lyle. That Thinn called for help *after* Lyle was unconscious does not suggest otherwise. Likewise, evidence that a sheriff's deputy was surprised at Thinn's placement given his race does not support a nonspeculative finding that Thinn reacted in perfect or imperfect self-defense. "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction" on either theory. (*Simon*, *supra*, 1 Cal.5th at

1
2

p. 132; *Hill*, *supra*, 131 Cal.App.4th at p. 1101.) On our record, no instructional error occurred.

3

(Dkt. 5-18 at 15–17 (alteration and emphasis in original)).

4
5
6
7
8
9
10
11
12
13
14
15

Respondent maintains "[b]ecause this claim only challenges the trial court's discretion under state law, it does not raise a federal question," but "[i]n any event, the state court's rejection of this claim was reasonable." (Dkt. 4-1 at 15). With respect to Respondent's first contention, the Court again acknowledges claims of error in the application of state law are generally not cognizable on federal habeas review. *See McGuire*, 502 U.S. at 67–68. Indeed, "violations of state law are not cognizable on federal habeas review." *Rhoades v. Henry*, 611 F.3d 1133, 1142 (9th Cir. 2010). Yet in this instance, Thinn clearly contends the trial court's refusal to instruct the jurors on perfect or imperfect self-defense violated his federal constitutional rights to a determination of all elements of the charged crimes beyond a reasonable doubt and to present a defense, (*see* Dkt. 1-2 at 13–17), which states a cognizable federal claim.

16
17
18
19
20
21
22
23
24
25
26
27
28

Again, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690 (quoting *Trombetta*, 467 U.S. at 485); *see also Holmes*, 547 U.S. at 324 (same). To this end, "[i]t is well-settled that a criminal defendant is entitled to a jury instruction 'on any defense which provides a legal defense to the charge against him and which has some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility.'" *United States v. Sotelo-Murillo*, 887 F.2d 176, 178 (9th Cir. 1989) (quoting *United States v. Yarbrough*, 852 F.2d 1522, 1541 (9th Cir. 1988)); *accord Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004) (citing *United States v. Scott*, 789 F.2d 795 (9th Cir. 1986)) ("Failure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable."); *Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is

entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.").

For state instructional error to rise to the level of a federal violation, a petitioner must show it "'so infected the entire trial that the resulting conviction violates due process.'" *McGuire*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Such alleged error "must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Naughten*, 414 U.S. at 147). Additionally, because this claim involves an omitted instruction rather than an erroneous one, Thinn bears an "especially heavy burden" to show prejudice from the trial court's decision. *See Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) ("'[A]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law' and, thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an 'especially heavy burden.'")).

In requesting self-defense instructions, trial defense counsel cited "red marks" on Thinn's chest as "evidence that there was some kind of physical altercation," and argued: "We don't know exactly what it was, but I think that it's sufficient for a juror to draw a conclusion that a fight occurred and that Mr. Thinn was acting in self-defense." (Dkt. 8-2 at 628). Presently, Thinn similarly asserts the red marks "suggest[ed] a physical struggle" and argues he "called for help . . . which suggested [Thinn] had not initiated an attack intended to kill." (Dkt. 1-2 at 15). While the Court agrees with Thinn's first assertion that these red marks would tend to suggest a physical altercation had occurred, such marks on their own don't indicate who was the aggressor or what precipitated any such struggle. The trial court similarly and reasonably found as much. (*See* Dkt. 8-2 at 629 ("So the question becomes this redness on his chest or his back, there's no evidence of where that came from. . . . [I]t's not inconsistent . . . that someone was strangled from behind. . . . [However,] [i]t doesn't show a fight. It may show a physical

altercation, depending on how you want to define that, but it doesn't show a fight that rises to a level of self-defense.")).

Thinn's latter assertion indeed appears hypothetical at best, as Thinn summoning assistance after strangling his cellmate does nothing to suggest that it was his cellmate, and not Thinn, who initiated the altercation. It might just have easily been Thinn who started the altercation, overwhelmed the victim, strangled him, and afterwards summoned help as either an act of remorse or because the altercation had gone further than Thinn had intended. Thinn also points to evidence introduced at trial as to "Petitioner's vulnerability," that "the jail was generally segregated by race," that Thinn was white and his two cellmates were black, and "that a deputy who worked at the jail found this fact remarkable." (Dkt. 1-2 at 16). The conclusions Thinn attempts to draw from this evidence are again tenuous, as that evidence at best only shows Thinn was perhaps housed in an atypical manner but does nothing to show race played any part in the killing nor that the incident was precipitated by the victim. Without any evidence whatsoever about what took place in the cell, Thinn's arguments and suggestions are simply speculative.

Thinn contends the asserted instructional error "lessened" the prosecution's "burden of proving beyond a reasonable doubt that the killing was not justified." (*Id.* at 17). However, the jurors were properly and thoroughly instructed on the prosecution's burden of proof, Thinn's presumption of innocence, and on reasonable doubt. (*See* Dkt. 8-2 at 813). Of specific relevance to Thinn's contentions, the trial court also instructed the jurors on the consideration of circumstantial evidence and instructed that if two *reasonable* conclusions could be drawn from such evidence, they "must accept the one that points to innocence." (*See id.* at 815–16).

Finally, the jurors were also instructed on the elements of the charged crime, including that the prosecution was required to prove malice aforethought to

prove Thinn was guilty of either first-degree or second-degree murder. (*See id.* at 822–24). The jurors were expressly instructed that proof of either express malice or implied malice was required to establish malice aforethought to prove murder and that:

> The defendant acted with express malice if he *unlawfully* intended to kill. The defendant acted with implied malice if, 1, he intentionally committed an act; 2, the natural and probable consequence of the act were dangerous to human life; 3, at the time he acted, he knew this act was dangerous to human life; and 4, he *deliberately acted with conscious disregard* for human life.

(*id.* at 822–23 (emphasis added)); *see also* Dkt. 5-2 at 92). The trial court also instructed the jurors: "The defendant is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation," discussed and defined each of those terms, and directed: "The People have the burden of proving beyond a reasonable doubt that the killing was first-degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first-degree murder and the murder is second degree." (Dkt. 8-2 at 823–24; *see also* Dkt. 5-2 at 93).

In the present case, given there was no record evidence introduced as to what occurred in the cell at the time the victim was killed, Thinn fails to show the state court acted unreasonably in rejecting Thinn's claim of error arising from the trial court's refusal to instruct the jurors on perfect or imperfect self-defense. *See Mathews*, 485 U.S. at 63; *see also Beardslee*, 358 F.3d at 577; *Sotelo-Murillo*, 887 F.2d at 178. Additionally, because the jurors were properly instructed on the burden of proof, reasonable doubt, and the elements of the charged crimes, and considering the asserted error with respect to the trial record and entire complement of jury instructions, Thinn hasn't shown the instructional error lessened the prosecution's burden of proof and fails to bear the "especially heavy burden," *Villafuerte*, 111 F.3d at 624 (quoting *Kibbe*, 431 U.S. at 155), of

demonstrating that the absence of the requested instructions "so infected the entire trial that the resulting conviction violates due process," *McGuire*, 502 U.S. at 72 (quoting *Naughten*, 414 U.S. at 147).

Because Thinn fails to show the state court rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts, Claim Two doesn't merit federal habeas relief. To the extent Thinn requests an evidentiary hearing on this claim, the Court's conclusion habeas relief isn't warranted based on a review of the record renders an evidentiary hearing unnecessary. *See Totten*, 137 F.3d at 1176.

### C.   Claim Three

Finally, Thinn asserts the cumulative effect of the errors identified in Claims One and Two deprived Petitioner of his federal right to due process and a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments. (Dkt. 1-2 at 17).

The California Court of Appeal rejected this claim in a reasoned decision as follows:

> Thinn argues that the cumulative effect of the court's evidentiary and instructional errors deprived him of due process. Having rejected both claims of error, "there is no cumulative prejudice to evaluate." (*People v. Lopez* (2018) 5 Cal.5th 339, 371.)

(Dkt. 5-18 at 17).

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973)); *see also Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996)) ("[E]ven if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so

prejudicial as to require reversal.'").

Because Thinn fails to state a claim of error as to either of the two claims presented in the Petition, the Court finds no possibility of cumulative error. *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation."). The Court thus can't conclude the state court rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts. Claim Three doesn't merit habeas relief. To the extent Thinn requests an evidentiary hearing on this claim, the Court's conclusion habeas relief isn't warranted based on a review of the record renders an evidentiary hearing unnecessary. *See Totten*, 137 F.3d at 1176. Thinn's Petition is **DENIED.**

## VI.   CERTIFICATE OF APPEALABILITY

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." 28 U.S.C. § 2254, Rule 11(a). "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The Court finds issuing a certificate of appealability isn't appropriate in this instance because reasonable jurists wouldn't find debatable or incorrect the Court's conclusion that none of Petitioner's three claims warrant federal habeas relief nor does the Court find any of the issues presented deserve encouragement to proceed further. *See* 28 U.S.C. § 2253(c); *Slack*, 529 U.S. at 484. A certificate of appealability is **DENIED**.

//

//

//

## VII.   CONCLUSION

For the reasons discussed, the Court **DENIES** Thinn's Petition for a Writ of Habeas Corpus and **DENIES** a certificate of appealability.

**IT IS SO ORDERED**.

Dated:  April 19, 2024

_Larry A. Burns_

**Hon. Larry Alan Burns**
United States District Judge

22-cv-2-LAB-VET